IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs November 20, 2013

**PERLEY WINKLER, JR. v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Monroe County**
**No. 11-124      Amy A. Reedy, Judge**

**No. E2012-02647-CCA-R3-PC - Filed February 10, 2014**

The petitioner, Perley Winkler, Jr., appeals the denial of his petition for post-conviction relief
from his 2008 Monroe County Criminal Court convictions of two counts of attempted first
degree murder and one count of attempted aggravated arson, claiming that the State withheld
material evidence at trial, that he was denied the effective assistance of counsel at trial, and
that the post-conviction court erred by refusing to allow the petitioner to treat his trial counsel
as an adverse party.  Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which JERRY L. SMITH
and D. KELLY THOMAS, JR., JJ., joined.

W. Tyler Weiss, Madisonville, Tennessee, for the appellant, Perley Winkler, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney
General; R. Steven Bebb, District Attorney General; and James Stutts and Paul Rush,
Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

        A Monroe County Criminal Court jury convicted both the petitioner and
Michael Aaron Jenkins of two counts each of attempted first degree murder and one count
each of attempted aggravated arson.  The trial court sentenced the petitioner to 40 years'
incarceration.  This court affirmed the judgments on direct appeal.  *See State v. Michael
Aaron Jenkins and Perley Winker, Jr.*, No. E2008-02321-CCA-R3-CD, slip op. at 1 (Tenn.
Crim. App., Knoxville, Feb. 17, 2011), *perm. app. denied* (Tenn. May 25, 2011).

        In *Michael Aaron Jenkins and Perley Winkler, Jr.*, this court summarized the

facts of the case as follows:

John David Senn testified that about 4:00 a.m. on April 17, 2007, he was awakened by one of his pit bull dogs. Senn got up to let his dog outside, looked out the small window in his back door, and saw two men in the yard. One man was standing behind Senn's station wagon and was pouring gasoline from a red gasoline jug onto the car. Senn said that the man was standing "right there at my back door" and that he recognized the man as "Spanky," Michael Aaron Jenkins. Senn stated that the second man was standing behind Senn's Oldsmobile 442, that the man was wearing thick glasses, and that he recognized the man as Perley Winkler, Jr. Senn said that the yard was well-lit by his back porch light and an outdoor utility light, that he got a clear view of the appellants for about five seconds, and that he saw Jenkins' side profile and Winkler's full face. Senn had seen the men one or two times previously. He said Jenkins was wearing a baseball cap with a rebel flag on it and a black jacket; he thought Winkler was wearing a black baseball cap. He said he had not given either of them permission to pour gasoline on his cars.

Senn testified that Jenkins dropped the gasoline jug and that the appellants ran into the woods. Senn woke his girlfriend, Sherri Turpin, and told her to call the police. He said he was "terrified" and grabbed his gun off the shelf above the stove. Senn walked onto the back porch and began shooting into the woods. Senn said that he fired eight shots, emptying the clip in his pistol, and that the gas fumes were burning his eyes. He said he heard a car start on Niles Ferry Road and "take off." Senn saw that the appellants had "gassed" his jacuzzi, the back porch, the side of the house, and both cars. One of the Oldsmobile's doors was open, and gasoline had been poured inside the car. Senn had never had any personal problems with either of the appellants. However, he said that Turpin's family was involved in an ongoing feud with Winkler and that Turpin's brother, Steve Abercrombie, "had quite a few problems" with Winkler. When the police arrived at the scene, Senn told them what had happened and that Jenkins and Winkler were responsible. While Senn was talking with the police, he drank a beer to calm his

nerves. Later, he picked out the appellants' photographs from a photograph array.

On cross-examination, Senn acknowledged that while Turpin was on the telephone with the 911 operator, he was giving information to Turpin. He also acknowledged that Turpin told the operator about only one man, described by Turpin to the operator as a person "with coke bottle glasses." Senn acknowledged that on the 911 tape, he could be heard saying the man was wearing "black britches and a green shirt." Senn told the police that one of the men was wearing an Atlanta Braves baseball cap but testified at the preliminary hearing that he saw a cap with a rebel flag on it. Regarding the man wearing the Atlanta Braves cap, Senn told the police he saw the man's "side view" for only two or three seconds. Upon being questioned by defense counsel about these discrepancies, Senn explained, "It all happened real fast."

Clara Hitson, the Department Head of Monroe County 911, testified that Sherri Turpin's 911 call was recorded. The State played the recording for the jury. During the call, Turpin told the operator, "I seen a guy running with a gas jug and I think it was Junior Winkler." She also told the operator, "I think he was trying to burn me out"; "I'm the sister of the guy he's wanting"; and "To get to my brother he would hurt me."

*State v. Michael Aaron Jenkins and Perley Winkler, Jr.*, slip op. at 2-3 (footnote omitted).

Sherri Turpin Senn, who married John Senn prior to the trial in the instant case, testified that Mr. Senn woke her at approximately 4:00 a.m. on April 17 at her home at 608 Mason Road and requested that she call 911, informing her that "they are gassing us" and that "I think it's Perley." *Id.* at 3. Mrs. Senn witnessed a man dousing their station wagon with gasoline from a red gasoline can, but she was unable to identify the man because he was facing away from her. *Id.* Mrs. Senn testified that her brother, Steve Abercrombie, had been feuding with the petitioner since 1991, and she stated that Mr. Abercrombie lived approximately 100 yards from Mrs. Senn's house. *Id.* One week prior to the April 17 incident, Mrs. Senn's sister-in-law, Lisa Abercrombie, played for Mrs. Senn a voicemail message that the petitioner had left on Mrs. Abercrombie's cellular telephone, in which, according to Mrs. Senn, the petitioner stated, "'You are going to die, you are going to burn.'" *Id.* Mrs. Senn explained that she recognized the petitioner's voice because she had grown

up with him. *Id.* Mrs. Senn acknowledged on cross-examination that she had failed to inform law enforcement officers about the voicemail message and that she incorrectly identified, in her 911 call, the petitioner as the man holding the gas can. *Id.* at 3-4.

Monroe County Sheriff's Department ("MCSD") Sergeant Darian Goodman testified that, when he responded to Mrs. Senn's 911 call, Mr. Senn identified one of the perpetrators as the petitioner. *Id.* at 4. Sergeant Goodman examined the scene and located a red gasoline jug on Mrs. Senn's property. *Id.* He also noticed "an oil-based liquid on both cars and one corner of the home" as well as "the strong smell of gasoline." *Id.* Sergeant Goodman opined that "'a reasonable person could at least identify somebody from where those people were in the light that was coming off the porch light.'" *Id.* MCSD Detective Michael Morgan spoke with Mr. Senn at the scene and testified at trial that Mr. Senn "was 'adamant' he had seen" the petitioner, noting that Mr. Senn had seen the petitioner "'head on' and described the glasses and everything." *Id.* Detective Morgan testified that Mrs. Senn "claimed to have seen a man from behind who she described as Winkler." *Id.* On cross-examination, Detective Morgan stated that, when law enforcement officers located the petitioner and Mr. Jenkins later on the morning of April 17, he "did not smell gasoline on either of the appellants." *Id.* at 5. Detective Morgan also acknowledged that the petitioner "was not wearing a green shirt or black pants, and nothing indicated he had showered recently." *Id.* Special Agent Laura Jane Hodge, a forensic scientist with the Tennessee Bureau of Investigation Crime Laboratory, testified that "she tested the substance in the red gasoline jug" and that it "contained gasoline, a flammable liquid." *Id.*

MCSD Lieutenant Travis Jones testified for Michael Jenkins and stated that, when he and fellow officers located Mr. Jenkins and the petitioner at the home of Josh Murphy on the morning of April 17, he found nothing at Mr. Murphy's residence "to link the appellants to the crimes." *Id.* at 5. On cross-examination, Lieutenant Jones admitted that the Toyota pickup truck parked at Mr. Murphy's residence "appeared to have been washed recently and that a water hose was lying on the ground next to it." *Id.* Josh Murphy testified that Mr. Jenkins had been at his residence on the evening of April 16 but that Mr. Jenkins left around 1:30 a.m. on April 17. *Id.* Mr. Murphy drove to Mr. Jenkins' house at approximately 6:00 a.m. on April 17 and drove Mr. Jenkins back to Mr. Murphy's own residence, where the petitioner arrived around 10:30 a.m. *Id.* Law enforcement officers arrived at Mr. Murphy's house at 11:30 a.m. and placed the petitioner and Mr. Jenkins under arrest. *Id.* Mr. Murphy did not smell gasoline on the petitioner, and Mr. Murphy opined that the petitioner looked as if "he had just woken up." *Id.*

Mr. Jenkins' mother, Patricia Ann Jenkins, testified that she drove Mr. Jenkins home on the morning of April 17, arriving at approximately 3:30 a.m. *Id.* at 5-6. Ms. Jenkins testified that her son "went directly to his bedroom" and did not leave the house

between 3:30 a.m. and 6:00 a.m., when Mr. Murphy arrived to pick up Mr. Jenkins. *Id.* at 6. Ms. Jenkins testified that her son had no contact with the petitioner between 3:30 a.m. and 6:00 a.m. *Id.*

Kathy J. Hawkins testified that she ate dinner with the petitioner on April 16 and that she left the petitioner at his residence before dark that evening. *Id.* at 6. Ms. Hawkins stated that, while she was with the petitioner, he made no threats or gave "any indication he was planning something." *Id.* Chuck Burris, a licensed private investigator, testified that he went to Mrs. Senn's Mason Road residence on November 20, and, using a laser while seated inside his vehicle, he measured the distance from Mrs. Senn's back door to the area where the petitioner was allegedly seen standing, finding the distance to be 53 yards. *Id.* at 7. Mr. Burris noticed only a porch light on a corner of the house and opined that the bulb from that light would not cast much light on the cars in Mrs. Senn's yard. *Id.* On cross-examination, Mr. Burris acknowledged that the Mason Road house was vacant and stated that "he did not see a utility light." *Id.*

On March 28, 2011, the petitioner filed, pro se, his initial petition for post-conviction relief, which petition was amended. Following the appointment of counsel and the amendment of the petition, the post-conviction court held an evidentiary hearing.

The petitioner testified that trial counsel was appointed to represent him when he was arraigned on the charges in the instant case. The petitioner recalled meeting with trial counsel one time at the jail for approximately 15 to 20 minutes prior to his preliminary hearing. At that meeting, the petitioner and trial counsel reviewed the petitioner's search warrants,[1] and trial counsel indicated that he thought the search warrants "were good." The petitioner testified that he expressed his disagreement with trial counsel's position. The petitioner stated that he had also requested that trial counsel subpoena some "people from the church," but trial counsel apparently disagreed and did not subpoena the requested church members. Between the preliminary hearing and the trial, the petitioner saw trial counsel only "a couple of times." On one of those occasions, trial counsel was accompanied by an investigator.

With respect to the truthfulness of Mr. and Mrs. Senn, the petitioner testified that trial counsel "said he thought that [the Senns were] lying about some stuff but he didn't do much to prove anything different." The petitioner testified that, once trial counsel was appointed to his case, trial counsel did not visit him for a few months and that once he did visit, he explained his absence by stating "'to tell you the truth I don't make that much money on these appointed cases and I feel like I have paid my dues in small court.'" The petitioner

---

[1]Trial counsel represented the petitioner on other matters as well.

stated that trial counsel failed to appear for "a couple" of his court dates, prompting the petitioner to request that the trial court dismiss trial counsel as his attorney, which the court refused to do. When trial counsel visited the petitioner at the jail shortly thereafter, trial counsel was surrounded by several police officers, and he explained that the officers "'feel like you are going to hurt me.'" At that point, the petitioner expressed to trial counsel how he felt about counsel's failure to appear for his hearings as well as his belief that counsel was "not taking [his] case to[o] seriously." According to the petitioner, trial counsel stated that, because the trial court refused to let him withdraw from the case, he intended "to do what he could" but that "there wasn't much conversation" with the petitioner after that time.

The petitioner stated that he could not recall trial counsel's ever discussing trial strategy with him; that counsel failed to provide him with a complete copy of his file prior to trial; and that counsel did not review discovery documents with him. The petitioner testified that trial counsel had never discussed with him a notation in the State's file that Mrs. Senn was refusing to testify "unless she was paid to relocate."

During the trial, Mrs. Senn testified that she had not heard from the petitioner in the past five years because he "had been in prison." Following this statement, trial counsel advised the petitioner against moving for a mistrial, assuring the petitioner that "he liked the way the trial was going and he didn't think they would find me guilty."

Following the trial, the petitioner spoke with trial counsel once over the telephone, but he could not recall if the conversation took place before or after the motion for new trial. The petitioner identified a letter he wrote to trial counsel on March 15, 2009, in which he inquired about his appeal and the issues that trial counsel intended to raise on appeal. The petitioner testified that trial counsel never responded to this letter and that trial counsel finally wrote to the petitioner to notify him that his appeal had been denied. The petitioner wrote several additional letters to trial counsel, and the petitioner testified that trial counsel did not respond.

On cross-examination, the petitioner acknowledged that he takes a "very active role" in his cases, that he conducts legal research on his cases, and that he "put[s] forth some arguments" that contain "'novel'" theories. The petitioner agreed that "it is generally the attorney's job to take some of the arguments that you propose and figure out which ones are the best to go with in court." The petitioner was "pretty sure" that trial counsel sent him no correspondence between the petitioner's arraignment and jury trial.

Lisa Abercrombie, John Senn's sister-in-law, testified that she played a voicemail message for Sherri Turpin Senn in which the petitioner threatened Mrs. Abercrombie's life. Mrs. Abercrombie stated that she informed law enforcement officers

about the voicemail message, but she did not turn the message over to the police.

Andrew Freiberg testified that he was the assistant district attorney who prosecuted the petitioner in the underlying case. Mr. Freiberg testified that the district attorney's office had an "open file discovery policy," which permitted defense attorneys "to inspect and make a copy of our complete file." Mr. Freiberg explained that nothing was withheld from defense counsel under this policy. As a practical matter, the right side of the file contained "all materials, including the indictment," and the left side of the file contained "things like witness list and work product." Defense attorneys would arrange a time to come to the district attorney's office to review the file, or the attorneys could request that the office make a photocopy of the file for defense counsel. With respect to a document in the petitioner's file entitled "Victim Assistance Program/Victim Contact Information," Mr. Freiberg confirmed that it would have been on the left side of the file. Mr. Freiberg testified that only one file existed in any case in the district attorney's office and that all information contained within those files was discoverable.

On cross-examination, Mr. Freiberg testified that the voicemail message in question did not exist at the time of trial, but he recalled that the voicemail message had been referenced or "alluded to at the time of the preliminary hearing of which [trial counsel] took part in." With respect to Mr. Senn's credibility, Mr. Freiberg specifically recalled that Mr. Senn recognized the petitioner immediately when he saw him standing outside his residence on the morning of April 17 and that he "saw [the petitioner] dead in the face, straight on, for a number of seconds."

MCSD Captain Travis Jones testified that he showed Mr. and Mrs. Senn a photographic lineup on April 17, but he did not recall now many photographs it included. He stated that "the standard number is usually six different photos on one piece of paper."

Trial counsel testified that he had been a licensed attorney for approximately 14 years and that he had "done a lot of criminal defense work" but that it was "not [his] primary area these days." Trial counsel admitted that he had been appointed to represent the petitioner in the instant case as well as a few additional cases. Trial counsel did not recall how many times he visited the petitioner prior to the preliminary hearing in the instant case, noting that, on occasion, he "would get appointed and potentially meet with that person just that morning." With respect to the Senns' credibility, trial counsel testified that he attempted to impeach them through inconsistent statements and their motives for testifying, given their apparent dislike for the petitioner. When questioned about his trial strategy, trial counsel responded that his goal was to show the jury that the Senns "either made a bad identification or they lied" to establish reasonable doubt.

Trial counsel reviewed the document entitled "Victim Assistance Program/Victim Contact Information," which indicated that Mrs. Senn "says if she gets no help to relocate she will not testify at trial." Trial counsel stated that he could not recall if he had ever seen that document on a prior occasion, but he acknowledged that it could have been potentially important in his cross-examination of Mrs. Senn. Trial counsel could not recall if he had ever received a photographic lineup through the discovery process, and, with respect to the voicemail message, he could only recall that the petitioner had made a threat against the victims' family member and that he "objected to that evidence being introduced most strenuously." Trial counsel testified that he had visited the district attorney's office and had spent time reviewing the petitioner's file and making copies. Trial counsel noted that the trial court had appointed investigators to assist him and stated that some of those investigators had likely assisted him in obtaining some of his information.

Trial counsel testified that he spoke with the petitioner "several times" at either the Monroe County jail or over the telephone and that his investigators spoke with the petitioner "several times." Trial counsel reported that the petitioner "was a very compliant client who . . . worked hard on his case and we worked hard with him." Counsel testified that his "philosophy on [the petitioner's] case was to get up early in the morning, stay late at night, and that's been my philosophy on every jury trial I've ever tried and I can tell you that that's what I did in this instance in preparing for the trial." Counsel emphasized that he was "always willing to meet with [the petitioner]" and that when the petitioner wished to speak with him, he "was never not receptive." When asked about the occasion when the petitioner requested the trial court to appoint him new counsel, trial counsel responded that he "[did] not remember that time at all." Trial counsel did recall being escorted by armed law enforcement officers to a visit with the petitioner at the jail, but he stated that he had not requested the officers and that he had never felt threatened by the petitioner. Trial counsel also did not recall stating that he did not have time for the petitioner's case because he was involved in "some serious federal matters." Counsel admitted that he was defending a multimillion-dollar lawsuit during his representation of the petitioner and, therefore, if he had made a statement about not having enough time for the petitioner, "it would have been [an] accurate statement."

Trial counsel recalled that Mrs. Senn, during her trial testimony, had made a statement about the petitioner's having spent the past five years in jail, and he recalled discussing the possibility of requesting a mistrial at that time. Trial counsel testified that he and the petitioner made the joint decision to continue with the trial because the trial court had instructed the jury "that they were not to consider that statement, that that was to be stricken from the record." Furthermore, trial counsel believed a request for a mistrial to be unnecessary because he felt that the trial was going well for the defense, and counsel testified that the petitioner "had a strong opinion that we should allow this case to go to the jury."

When asked why he chose not to object during the prosecutor's closing argument to statements made about the credibility and veracity of the victims, trial counsel responded that it was a strategic move and that he believed some of the prosecutor's statements actually benefitted the petitioner.

With this evidence, the post-conviction court denied relief. The court specifically found that the petitioner failed to prove, by clear and convincing evidence, that the State suppressed any exculpatory evidence or that said evidence was unknown to trial counsel, and it further found that the petitioner failed to prove by clear and convincing evidence that trial counsel's representation was deficient.

On appeal, the petitioner contends that the State withheld material evidence, violating the tenets of *Brady v. Maryland*, 373 U.S. 83 (1963), that he was denied the effective assistance of counsel, and that the trial court erred by refusing to allow the petitioner's attorney to treat trial counsel as an adverse party. We consider each claim in turn.

We view the petitioner's claims with a few well-settled principles in mind. Post-conviction relief is available only "when the conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103 (2006). A post-conviction petitioner bears the burden of proving his or her factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

*I. Brady Violations*

The petitioner first contends that the State violated the requirements of *Brady v. Maryland*, 373 U.S. 83 (1963), when the State failed to provide the petitioner with both the "Victim Assistance Program/Victim Contact Information" document, which included the notation that Mrs. Senn would not testify at trial unless she received assistance in relocating, and the photographic lineup. The State submits that the petitioner failed to demonstrate that either of those items were withheld from him, and, as such, the defendant could not establish a *Brady* violation.

The constitutional right to a fair trial imposes upon the State "duties consistent

with the[] sovereign obligation to ensure 'that justice shall be done' in all criminal prosecutions." *Cone v. Bell*, 556 U.S. 449, 451 (2009) (quoting *United States v. Agurs*, 427 U.S. 97, 111 (1976) (citation and internal quotation marks omitted)). In *Brady*, the United States Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. "Evidence 'favorable to an accused' includes evidence deemed to be exculpatory in nature and evidence that could be used to impeach the [S]tate's witnesses." *Johnson v. State*, 38 S.W.3d 52, 55-56 (Tenn. 2001) (citing *State v. Walker*, 910 S.W.2d 381, 389 (Tenn. 1995); *State v. Copeland*, 983 S.W.2d 703, 706 (Tenn. Crim. App. 1998); *United States v. Bagley*, 473 U.S. 667, 676 (1985)). The duty to disclose exculpatory evidence extends to all "favorable information" irrespective of whether the evidence is admissible at trial. *State v. Robinson*, 146 S.W.3d 469, 512 (Tenn. 2004) (appendix); *Johnson*, 38 S.W.3d at 56. *Brady* and its progeny create in the "individual prosecutor . . . a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).

> To prove a *Brady* violation, a defendant must demonstrate:
>
> (1) that he requested the information (unless the evidence is obviously exculpatory, in which case the [S]tate is bound to release the information whether requested or not),
>
> (2) that the State suppressed the information,
>
> (3) that the information was favorable to the defendant, and
>
> (4) that the information was material.

*Johnson*, 38 S.W.3d at 56 (citing *State v. Edgin*, 902 S.W.2d 387, 390 (Tenn. 1995); *Walker*, 910 S.W.2d at 389); *see also Strickler v. Greene*, 527 U.S. 263, 281-82 (1999) ("There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."). The evidence is deemed material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682.

> The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but

whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'

*Kyles*, 514 U.S. at 434 (quoting *Bagley*, 473 U.S. at 678). Plainly stated, establishing materiality requires a "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435; *see Johnson*, 38 S.W.3d at 58.

In the instant case, Mr. Freiberg, the prosecutor at trial, testified that the document containing the statement about Mrs. Senn was located on the left side of the prosecutor's file and that, pursuant to the office's "open file discovery policy," all materials in that file were discoverable. Trial counsel could not recall having seen that document and stated that, although he did review and make copies of the petitioner's file, investigators who worked on the case likely assisted him in obtaining copies of information in the file as well. With respect to the photographic lineup, Captain Jones testified that he showed the lineup to the Senns, but he could not recall how many photographs it contained. Trial counsel did not recall whether he had received the lineup material during the discovery process, and the photographic lineup was not submitted as an exhibit at trial. Nothing in the record indicates that the State suppressed either the document pertaining to Mrs. Senn or the photographic lineup. Moreover, with respect to the lineup, the petitioner has failed to demonstrate that it was material or favorable to his defense. Before viewing the lineup, Mr. Senn had already identified the petitioner to the 911 operator as one of the two men he had seen behind his house. As such, the defendant has failed to establish a *Brady* violation.

## *II. Ineffective Assistance of Counsel*

The petitioner next contends that trial counsel was ineffective because counsel failed to prepare an adequate record on appeal; failed to cultivate an effective attorney-client relationship with the petitioner; failed to move for a mistrial following Mrs. Senn's statement about the petitioner's time in prison; and failed to object to inflammatory remarks made by the prosecutor during closing argument.

To establish entitlement to relief via a claim of ineffective assistance of counsel, the defendant must affirmatively establish first that "the advice given, or the services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases," *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and second that his counsel's deficient performance "actually had an adverse effect on the defense," *Strickland*

-11-

*v. Washington*, 466 U.S. 668, 693 (1984). In other words, the defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Should the defendant fail to establish either deficient performance or prejudice, he is not entitled to relief. *Id.* at 697; *Goud v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.

When reviewing a claim of ineffective assistance of counsel, we will not grant the defendant the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Claims of ineffective assistance of counsel are mixed questions of law and fact. *Lane v. State*, 316 S.W.3d 555, 562 (Tenn. 2010); *State v. Honeycutt*, 54 S.W.3d 762, 766-67 (Tenn. 2001); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). When reviewing the application of law to the trial court's factual findings, our review is de novo, and the trial court's conclusions of law are given no presumption of correctness. *Fields*, 40 S.W.3d at 457-58; *see also State v. England*, 19 S.W.3d 762, 766 (Tenn. 2000).

In our view, the record supports the post-conviction court's denial of relief. With respect to the preparation of the appellate record, the petitioner notes that the issues in his original appeal included the trial court's alleged error by prohibiting impeachment of Mr. Senn with a prior conviction and by permitting the State to question Mrs. Senn about the threatening voicemail message. *Michael Aaron Jenkins and Perley Winker, Jr.*, slip op. at 7. This court declined to review either of those issues due to the appellants' failure to include in the record the transcript from the hearing on the motion for new trial. *Id.* The fact that trial counsel failed to prepare an adequate appellate record does not, standing alone, amount to ineffective assistance of counsel. First, as stated by the post-conviction court in its denial of relief, the petitioner "has failed to show what was specifically left out of the appellate record." Second, and more importantly, the petitioner has failed to establish how he was prejudiced by this failure.

Although the petitioner claimed that he had a very tense relationship with trial counsel, trial counsel testified that he and the petitioner had a good working relationship and that he was always willing and receptive to meeting or speaking with the petitioner. The petitioner argues that trial counsel should have moved for a mistrial when Mrs. Senn

mentioned the petitioner's time in prison, but trial counsel testified that the decision to continue with the trial was a joint decision with the petitioner, testimony that was accredited by the post-conviction court. With respect to the petitioner's claim that trial counsel should have objected to inflammatory remarks made by the prosecutor during closing argument, trial counsel testified that it was a strategic move based on his belief that some of the prosecutor's statements actually benefitted the petitioner, and we will not second-guess this reasonable trial strategy. *See Adkins*, 911 S.W.2d at 347. As such, we hold the petitioner has failed to prove by clear and convincing evidence that trial counsel's representation was deficient or prejudicial.

### *III. Adverse Party*

Finally, the petitioner argues that the trial court erred by refusing to allow him to use leading questions when conducting his direct examination of trial counsel in the post-conviction evidentiary hearing, claiming that the State's defense of the petitioner's assertion that trial counsel's performance was deficient necessarily resulted in trial counsel's identification with an adverse party. The petitioner claims that, under Tennessee Rule of Evidence 611(c)(2), he should be permitted the use of leading questions because trial counsel qualified as an adverse party. We disagree.

This court has previously held that an "original trial attorney is not an adverse party in a post-conviction proceeding." *Best v. State*, 708 S.W.2d 421, 423 (Tenn. Crim. App. 1985). If a petitioner wishes to use leading questions in his examination of trial counsel, "the petitioner must first demonstrate to the trial judge that the attorney is in fact a hostile witness." *Id.* In the instant case, nothing in the post-conviction hearing transcript indicates that trial counsel was in any way hostile. Accordingly, the post-conviction court acted within its discretion by denying the petitioner's request.

### *IV. Conclusion*

The petitioner failed to establish either a *Brady* violation or that he was denied the effective assistance of counsel at trial. The trial court did not abuse its discretion by denying the petitioner's request to treat trial counsel as an adverse party during the post-conviction hearing. Accordingly, the judgment of the post-conviction court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE